# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DAVID H. PLEMONS,            )
                                     )
      Petitioner,                )         NO. 1:09-0048
                                       )         JUDGE HAYNES
                                     )
                                     )
JAMES FORTNER, Warden,     )
                                     )
      Respondent.             )

## MEMORANDUM

Petitioner, David H. Plemons, filed a pro se action under 28 U.S.C. § 2254, seeking to set aside his conviction for second degree murder, for which he received a sentence of 19 years. After a review of the petition, the Court appointed the Federal Public Defender to represent the Petitioner, and a second amended petition was filed on March 8, 2010.[1] Petitioner's specific claims are that: (1) the evidence at his trial was insufficient to support a conviction; and (2) he was denied ineffective assistance of counsel based upon his counsel's failure to use evidence of Petitioner's mental illness to complement Petitioner's assertion of self-defense.[2]

Before the Court are Petitioner's motion for summary judgment (Docket Entry No. 40) and the Respondent's motion for summary judgment (Docket Entry No. 38). In his motion, Petitioner

---

[1]The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005) ; Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supercedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supercede the pro se petition.

[2]Petitioner also asserted additional grounds for his ineffective assistance of counsel claim and a claim under Brady v. Maryland, 373 U.S. 83 (1963). However, Petitioner conceded that these claims would not support relief. (Docket Entry No. 40, at 1). Accordingly, the Court deems these claims abandoned.

contends that the state's evidence failed to prove that Petitioner did not act in self-defense and that Petitioner's counsel failed to use Petitioner's mental illness evidence to pursue, in the alternative, the defense of imperfect self-defense. Respondent contends that the state courts' ruling on Petitioner's self-defense claim was a reasonable application of federal law and that Petitioner's ineffective assistance of counsel claim is procedurally barred.

## A. Procedural History

On October 15, 2003, a jury convicted Petitioner of second degree murder, and Petitioner was sentenced to 19 years in prison. (Docket Entry No. 27, Notice of Filing, Attachment 1, at 92, 99). On appeal, the Tennessee Court of Criminal Appeals affirmed his conviction and sentence. State v. Plemons, No. M2004-00460-CCA-R3-CD, 2005 WL 468306 (Tenn. Crim. App. Feb. 24, 2005). On June 20, 2005, the Tennessee Supreme Court denied petitioner's application for permission to appeal from the judgment of the Court of Criminal Appeals.

On or around March 31, 2006, Petitioner filed a petition for post-conviction relief that was denied. (Docket Entry No. 28, Notice of Filing, Attachment 1, at 5, 58-62). On December 2, 2008, the Tennessee Court of Criminal Appeals affirmed the trial court order and on April 27, 2009, the Tennessee Supreme Court denied his application for permission to appeal. Plemons v. State, No. M2007–00549-CCA-R3-PC, 2008 WL 5069193 (Tenn. Crim. App. Dec. 2, 2008).

## B. Review of the State Record

The facts[3] underlying the Petitioner's conviction are set forth by the Tennessee Court of Criminal Appeals as follows:

---

[3]State appellate court opinion findings can constitute factual findings under 28 U.S.C. § 2254(d) with a statutory presumption of correctness. Sumner v. Mata, 449 U.S. 539, 546-47 (1981).

At the Defendant's trial, the following evidence was presented: Donna Land testified that she and the victim were married for ten years preceding his death. She said that she and the victim lived together in their trailer home, and the Defendant lived in a trailer "around the corner." Land testified that she did not meet the Defendant until she moved into the trailer, but the victim was friends with the Defendant as a teenager when they "fought chickens" together. She stated that, after she and the victim moved into the trailer, the victim and the Defendant started "fighting chickens" again, and the victim began to spend a lot of time with the Defendant. Land said that she left the victim about fourteen months after they moved into the trailer together, and she did not have any further contact with him in the four months before he was killed. She said that she had never been in the Defendant's trailer.

Donna Land testified that the victim had problems maintaining employment, and he had problems because he had been raped in his youth and suffered from manic depression. She explained that the victim previously had a problem with drug abuse and had overcome his drug addiction, but, in the four months prior to her leaving, the victim began to abuse drugs again. She said that the Defendant helped the victim apply for government disability assistance, and the victim began to receive checks for disability the same month that he started abusing drugs again.

On cross examination, Donna Land testified that the victim had a previous problem with alcohol, but he had not consumed alcohol in the three years preceding his death. She admitted that the victim had been violent when he was abusing alcohol. She admitted that, on two prior occasions, the police were called to their home because of an argument between them, and the victim resisted arrest. Land said that, when she moved out of the trailer, she stayed at a women's shelter, but she denied that the shelter was a "battered women's" shelter. She said that the victim hid his cocaine consumption from her, and it was months before she realized that the victim was using cocaine in the Defendant's trailer. She admitted that the victim smoked marijuana in front of her, but she said that he was not violent when under the influence of marijuana.

On redirect examination, Land testified that, when the police were called on these two prior occasions, the victim never hit her. Land stated that these arguments between the victim and her involved primarily arguing, pushing, shoving, slapping, or hair pulling. She said that the victim was not violent toward her, even after he began using drugs. She said that she saw the victim in a parking lot about a month and a half before his death, and he gave her a dozen roses and begged her to come home. She testified that the Defendant drove the victim whenever and wherever he needed to go. On re-cross examination, she admitted that, on one occasion when the police came to their home, Land was handcuffed, leg cuffed, and sprayed with pepper spray because he resisted arrest.

Deputy James Darnell, of the Marshall County Sheriff's Department, testified that, on the morning of September 4, 2002, he went to the victim's trailer in response to a dispatch call about a possible suicide attempt. Deputy Darnell said that, when he arrived at the trailer, he knocked on the door but received no response. He said that he was waiting in his car for Chief Deputy Billy Lamb to arrive when he noticed the victim walking up the road from the direction of the Defendant's trailer. The deputy stated that he approached the victim and inquired about his alleged suicidal intentions. He said that Chief Lamb arrived while he was speaking with the victim and that the victim explained that he did not intend to harm himself, but he "had taken more medication than what he should have ... because he was mad at his mother...." Deputy Darnell said that the victim agreed to go to the hospital with the paramedics, and the victim did not act violent or confrontational. Deputy Darnell said that he followed the ambulance that took the victim to the hospital and then left the hospital about thirteen minutes after arriving. The deputy recalled that he returned to the hospital because a nurse notified him that the victim had become "a little unruly," but he explained that the victim had calmed down when he arrived. He said that the victim had only wanted to go outside and smoke a cigarette, and the victim did not display any violent or aggressive behavior. He recalled that the victim used the telephone at the hospital, but he did not hear the victim's entire conversation. Deputy Darnell testified that he drove the victim back to his trailer in the early afternoon, and the victim was not "angry" but "[h]e was upset with his mother...." The deputy recalled that, when he dropped the victim off in his driveway, the victim began walking toward his mailbox, and the deputy drove away. He did not see which direction the victim went from there.

Deputy Darnell testified that a little over fifteen minutes later, he received a dispatch call about a shooting at the Defendant's address. The deputy recalled that dispatch relayed that the Defendant shot the victim with a shotgun. He explained that the Defendant's trailer is within one tenth of a mile of the victim's residence. He said that, when he arrived at the Defendant's trailer, he entered the yard through the gate. He recalled that the victim was dead when he arrived, had a visible gunshot wound on his face, and was lying on the ground with his feet on the steps to the trailer. The deputy said that the Defendant exited the trailer with his hands up, and he handcuffed the Defendant. He testified:

> [The Defendant] told me he was sorry, but he didn't think he had [any] other choice, that Mr. Land had come in his yard, slung his gate open, kicked his grill over, was cussing him and threatening to come in and whip his and his wife's ass[es].... [H]e was trying to get in the house.

He said that the Sheriff, other officers, and a crime scene investigator with the Tennessee Bureau of Investigation ("TBI") also came to the Defendant's trailer.

On cross examination, the deputy testified that, when he was dispatched to the victim's trailer the first time, for the suicide call, the dispatcher told him that the victim might have a gun. He said that, when he arrived, he searched the victim and glanced around the living room of his trailer, but he did not see a gun, and the victim denied having a gun. Deputy Darnell testified that the other two officers that responded to the dispatch call that morning were in route when he arrived, but, once he arrived, he did not feel that he needed "back up." He said that, when he returned to the hospital, the victim was calm and remained calm. He said that he did not hear the victim curse at any time, and, when the victim discussed his mother, he was calm, although "upset." The deputy confirmed that the Defendant's charcoal grill was laying on the ground. He said that the Defendant told him that he told the victim not to come into his house.

On redirect examination, the deputy said that, when he spoke with the victim that morning, the victim told him that, while he was talking with his mother on the phone earlier that morning, he hit the coffee table with a baseball bat.

Norman Dalton, a Captain Detective with the Marshall County Sheriff's Department, testified that he and the sheriff responded to the dispatch call about the shooting at the Defendant's trailer. He said that he and the sheriff arrived and found Deputy Darnell at the scene with the Defendant in handcuffs and the victim lying face-up on the ground, with his feet on the steps. He testified that he entered the trailer and noticed "human teeth, skull fragments scattered on the floor, blood spots on the wall." The officer recalled that a shotgun was standing up against a chair and a shell was lying on the floor. He said that the Defendant's wife, Michelle Plemons, was in the kitchen of the trailer, and, at his request, Plemons came outside the trailer. He said that he interviewed Plemons shortly after she left the trailer, and she was very upset and crying. Captain Dalton testified that, when he arrived, the Defendant told him that "he didn't mean to do it ... [the victim] threatened to whip m[y] and my wife's ass[es]" and that the victim left threatening messages on the answering machine. The officer recalled that the Defendant told him that he told the victim to not enter the house, but the victim "kept coming." On cross examination, Captain Dalton testified that the Defendant was "a little nervous ... excited" when the officer arrived and spoke to him. He described the Defendant's wife's condition as "hysterical."

Chief Deputy Lamb testified that he arrived at the Defendant's trailer shortly after Deputy Darnell, and the other officers. He said that, a few minutes after he arrived, the Defendant began knocking on the window from inside a patrol car, trying to get

someone's attention. The officer stated that he opened the door of the patrol car, and the Defendant began speaking to him. Lamb recalled that the Defendant asked the officer to "tell his wife he loved her and that he didn't mean to do it." The officer said the Defendant told him that he was asleep inside the trailer when the victim began entering the house, and he told the victim not to come inside, to which the victim responded that he was not afraid of the shotgun. Deputy Lamb said that he then shut the patrol car door and walked away. On cross examination, Deputy Lamb testified that, while at the scene of the crime, he had only one brief conversation with the Defendant, and he did not speak to Michelle Plemons. Deputy Lamb said that the Defendant was "upset" but "calm." He admitted that he did not know what demeanor to expect from someone who just shot another person.

Michelle Plemons, the Defendant's wife, testified that the Defendant is disabled and unemployed. She said that the Defendant raises fighting chickens on the property where their trailer is located, which is, approximately, a four acre tract. Plemons said that she had known the victim for a little over a year, and had never seen or heard the victim threaten her or the Defendant. She recalled that the victim came to their trailer almost every day, usually two or three times a day. She said that the victim and the Defendant were friends, and the victim would spend time at the trailer talking with the Defendant and helping take care of the chickens. She said that she and the Defendant drove the victim wherever and whenever he needed to go anywhere. Plemons testified that the Defendant and the victim were not in business together.

She testified that, the day before the shooting, she went out to run some errands, and, when she returned, the victim was visiting with the Defendant in their trailer. She recalled that, after the mail was delivered, she and the Defendant drove the victim to visit his mother in Franklin. She stated that, while at the victim's mother's house, she overheard the victim call the pharmacy and call his children. She testified that no one was hostile during the visit. Afterwards, she testified, they went to pick up the victim's prescription for Klonopin, and she, the Defendant, and the victim each took one of the pills. They then drove the victim to cash his disability check at a local market. Next, she recalled, they drove the victim to pick up a prescription for his heartburn medicine. She said that the victim was hungry, so she and the Defendant drove him to another market to purchase barbeque and beer. She could not remember whether the victim purchased a six pack or a twelve pack of beer. She said that the three of them split the food, and the victim and the Defendant drank all but two or three of the beers. She said that, after they ate, the victim wanted to obtain some cocaine, so they all drove to purchase cocaine, but the dealer was not at home. She said that the victim then asked if they could go to Nashville to purchase cocaine, which they did. She recalled that the victim injected some cocaine with a needle while the three were driving home. Plemons said that they all went back to her and the Defendant's trailer where she, the Defendant, and the victim consumed the remainder of the cocaine. She said that the victim offered to pay Plemons and the

Defendant $100.00 if they would drive him back to Nashville to purchase more cocaine, and they accepted. Plemons explained that the victim used all but "a little bit" of this second cocaine purchase, and eventually left their trailer at around 4:30 a.m., at which time she and the Defendant went to bed. She testified that it was unusual for the victim to stay as late as he did that night.

Plemons stated that she awoke later that morning to the sound of the victim's voice on the answering machine, "cursing." She said he asked where the Plemonses were and why they were not answering their phone, and he stated that he was at the hospital and needed a ride. She denied that the victim made any threats during this message. She testified that the Defendant called the hospital, identified himself as the victim's brother, and inquired about the victim. Plemons recalled that she and the Defendant then went to make a cup of coffee, and the victim's mother called. She said they did not answer but let the machine record a message. She testified that, thereafter, the victim called and spoke briefly with the Defendant, and the Defendant did not seem upset or angry after this call. After he hung up, the victim called again. She testified that, when the Defendant hung up the phone, he looked "shocked." She denied that her husband was angry or yelling. She admitted that she previously told investigators that the Defendant was "yelling" on this call, and she added that she remembered the Defendant refusing to drive the victim somewhere. She denied that her husband told the victim, "come on." Plemons recalled that her husband was walking past the window and said "there is [the victim]," and then he picked up the 12-gauge shotgun that he kept next to the door. She said that she reached to take the gun away from her husband, but he pulled it out of her grasp. She said that, by this point, the victim was at the front door.

Plemons explained that the trailer has two doors, a storm door and a metal main entry door. She said that the main door has a "twist-type" deadbolt lock. She did not remember whether the door was locked when the victim arrived at the house, but she agreed that the Defendant could have locked the deadbolt instead of picking up the shotgun, with no extra effort or time. She recalled that the victim was yelling for the Defendant to let him inside the trailer and that he was not afraid of the shotgun. She said that she did not remember who opened the main door, but admitted that, in two previous statements to the police, she said that the Defendant opened the interior door. Plemons related that "[the victim] came into the trailer and [the Defendant] shot him." When questioned about how far "into" the trailer the victim came before he was shot, Plemons stated that she could see his face but was unsure whether one or both of the victim's feet entered the trailer. Explaining further, Plemons stated that the victim was completely inside, with both feet inside the trailer. She said that, after the shot, the victim fell back against the door frame and "slid down" out of the trailer, down the steps. She recalled that she took the gun from her husband and called 911 while she unloaded the shell from the shotgun.

She said that her husband did not speak to the 911 operator. She testified that she did not remember whether the Defendant was in the background screaming and cursing. Plemons stated that the Defendant left the trailer while she was on the phone, but she did not know why or where he went because she was speaking with the 911 operators. She conceded that the Defendant was concerned that the chickens would escape and likely went outside to close the gate that the victim left open.

On cross examination, Plemons testified that neither she nor the Defendant left the trailer in the time between the victim's answering machine message and the shooting. She said she did not know that her husband had already been outside before she awoke. She stated that, when she called 911, both she and the Defendant were upset, and the Defendant was screaming and yelling. Plemons said that she tried to take the gun to protect herself. She said that she was afraid for the Defendant and herself because she did not know what the victim would do, because he had been acting strange. Plemons said that the victim would normally call before he came over, and knock on the door before he entered the trailer. Plemons stated that the Defendant appeared shocked that the victim had come to the trailer. She explained that, when she made her initial statements to the police, she was upset, nervous, and hysterical at times.

On redirect examination, she admitted that she made her initial statements to the police seven hours after the shooting, and had calmed down some. She admitted that she also made statements several months after the shooting, and was no longer "hysterical." She admitted that she tried to take the gun away from the Defendant because she was afraid that the Defendant would shoot the victim. On re-cross examination, Plemons explained that she felt she was more rational than the Defendant and could make a better decision as to how to react to the victim' s behavior.

TBI Agent Wayne Wesson testified that he assisted with the crime scene investigation at the Defendant's trailer. He said that he interviewed Michelle Plemons the night of the shooting, and she told him that the main door was locked when the victim arrived. Further, Agent Wesson recounted, Plemons told him that the victim opened the storm door but the Defendant opened the main interior door. He recalled that, when he interviewed her several months later, she told him that she could not remember whether the main door was locked when the victim came over the day of the shooting. He said that she explained that the Defendant had already been outside that morning, and was not sure if he had locked the door when he came back inside. Wesson stated that Plemons never said that the victim had both feet inside the trailer when he was shot. Further, the Agent said, Plemons never said that the reason she tried to take the shotgun was to protect herself, but she told him that she would not have shot the victim unless circumstances had escalated.

Agent Wesson testified that the victim's body was lying at an angle, to the left of steps outside the trailer, face-up, with his feet on the first and second stairs. He said that there was a large quantity of blood on the stairs, and a blood stain running up the victim's left pant leg to his right shoulder. He noted that the back of the victim's shirt was soaked in blood, likely caused by the massive bleeding from the gunshot wound to his face, which "puddl[ed]" under his body. Agent Wesson testified that he determined that the victim had been inside the storm door when the Defendant shot him. He said that, just inside the main interior door of the trailer, he noticed some teeth and other human matter. He recalled that he located one spot of blood about six feet into the trailer, "down the hall to the right." He testified that the evidence and wound indicated that, when the Defendant shot the victim, the gun was in close range to, but not in contact with, the victim's face. Agent Wesson said that a close range shotgun gunshot to the face would cause human matter and blood to go in different directions. He said that, when the body is shot with a shotgun, "the body goes straight down ... In movies they blow back, go flying across the room. In real life, that does not happen." He testified that he located blood on the inside of the doorjamb. He said that almost all of this blood was "streaming down" from approximately thirty-two inches above the floor, and he concluded that this height is where the blood hit the doorjamb. Based on this evidence, he testified that Michelle Plemons' account of the incident-that the victim fell back against the doorjamb and slid down-was impossible.

Agent Wesson testified that he made a recording of the messages on the Defendant's answering machine. He said that there were several messages from the victim's mother, who was trying to locate the victim, and one message from the victim. The agent testified that the victim's message seemed "more a frustrated friend trying to get a friend to come and get him. It wasn't a threat." Agent Wesson said that he noticed a shotgun, with the breech open, propped up against the couch inside the trailer. The agent identified the shotgun and empty shell cartridge that he found at the scene, and testified that that gun and shell were tested and confirmed to be the cause of the victim's death.

Agent Wesson testified that, approximately an hour and a half after the shooting, he took the Defendant's statement. He said that, during this interview, the Defendant was "excited ... hyper ... jump[ing] from one topic to another." The Defendant's statement, which was admitted into evidence read as follows:

On 9/3/02, I took [the victim] to get his Social Security Check and to get it cashed. I have known him all my life. I have treated him like a brother. I have taken him to doctors all over the place. He ask[ed] me yesterday to get him some cocaine and other stuff [and] drugs. He finally did get some Klonopin. He had a refill at Kroger's, and I didn't know it. Today he called me up and he said that he wanted me to take him to get some dope. I said no that I wasn't going to do it. It made him mad. Before that he had come to my house. I was drinking coffee and it was this morning. He

ask[ed] me to go with him to his house to call his mama. My wife was asleep. When he called his mama, he began to yell and told her, "I am going to kill you, you f* * *in b* * * *." ... He called Ms. Sparks, the lady that owns the land he lives on.... He also told her that he was going to be the worst hell-raiser there ever was till she threw him off the place.... He told her "you f* * *ing fat b* * * *, I ain't paying no more rent." He yelled at her and carried on. I left him and walked home. A while later [the victim] called me and left a message. He was yelling for me to answer the phone. I was asleep or outside or something. He was raising hell. He called again and was yelling and talking fast. I hung up on him. He called again and said he didn't like me hanging up on him. Then he hung up on me.... I was in bed and la[i]d back down after he hung up.... The next thing I knew he walked down to my house and opened the front gate. He left the gate open. I always keep that gate closed because of my chickens. I have a shotgun.... I keep it by the front door. Sometimes I keep it loaded. When [the victim] got to my house he started beating on the front door. He was yelling, "open the door, you mother f* * *er ... I'll show you, you son of a b* * * *." I opened the front door and tried to reason with him. He had the storm door open and was already on the top step. He pushed on the metal door, and I tried to keep it closed. He said, "I ain't afraid of you or that shotgun." When he came inside, I shot him. I shot him back out the door. I had already told him on the phone to leave me alone that I wasn't taking him anywhere else. When he pushed his way inside of my house, I shot him.

Agent Wesson testified that he questioned the Defendant about why he shot the victim, and, as noted on the Defendant's statement, he replied, "I was scared for my life. [the victim] has beat me, stole from me; and I was afraid of him." Further, according to Agent Wesson, the Defendant stated that the victim came to his house every day to help with the chickens, and the victim did not have a weapon when he entered the Plemons' yard. The Defendant told Agent Wesson, however, that he was not looking for a weapon, but the victim had made threats and had beaten him up before. Agent Wesson testified that, when officers found marijuana growing on the Defendant's property behind the trailer, he took a second statement from the Defendant, in which the Defendant admitted that the victim helped him grow marijuana.

On cross-examination, Agent Wesson admitted that he has never seen a human body be shot with a twelve gauge shotgun, but, from his training and experience, the body does not "fly backwards." He said that, based on the location of blood and matter from the "blow back" effect of the shot entering the body, the victim's head must have been in the door, just above where the blood was found inside the door frame. The agent explained that the body, after being shot, would have fallen backwards, and he explained how the exact nature of the body's fall was evident in the blood pattern at the scene as well as blood stains on, and the position of, the victim's body itself. Agent Wesson stated that he did not know exactly what effect falling against

the screen door would have had on the victims's movement, but he stated that the victim outweighed the door "quite a bit." He conceded that he is not a ballistics or firearms expert. He testified that the victim must have been "coming in" when the Defendant shot him. On redirect examination, Agent Wesson testified that, during his investigation and interviews with various friends and family, he found no evidence to support the Defendant's contention that he was afraid of the victim.

Detective Samuel Bragg testified that he was responsible for collecting the evidence at the Defendant's trailer, and he was present when Agent Wesson interviewed Plemons. Detective Bragg stated that there was no weapon found in the area around the victim's body and no marks found on the door to suggest that the victim used any item in an attempt to gain entry into the Defendant's trailer. The Detective recalled that he had gone to the victim's trailer the morning of the shooting in response to a dispatch call of a possible suicide attempt. He stated that he saw a baseball bat on the victim's coffee table, but he saw no other weapons. On cross examination, Detective Bragg testified that he was looking for a weapon at the victim's trailer the morning of the shooting because he received information that led him to believe there could be a weapon. He recalled that the victim was "fairly normal ... excited, maybe a little upset" when he spoke to him that morning. He admitted that the victim was "aggravated" with his mother. He said that the presence of blood on the Defendant indicated that the Defendant was in close proximity to the victim when he shot the victim.

Dr. Jon Gerber testified that he is the medical examiner who conducted the victim's autopsy. He stated that the victim was 72.5 inches tall and weighed 202 pounds. He said that the victim died from a shotgun wound to the face. He testified that his examination of the wound revealed that, when the victim was shot, the shotgun barrel was between one and two feet away from his face. He said that the wound was slightly upward and did not exit the back of the head. Gerber testified that the victim's body had several abrasions and contusions that were consistent with the body falling down the four steps of the Defendant's trailer. On cross examination, Dr. Gerber testified that "blow back" pushes tissue and matter in various directions, and matter going in only one direction would be "highly unlikely." He said that, with the angle of the wound, if someone were crouched over, the gun would have to be held lower than the entrance point of the wound. The doctor affirmed that he conducted toxicology tests in the course of the autopsy, and he reported that he found the presence of an antidepressant. He testified that antidepressants help to control behavior and impulses. Further, he determined the presence of marijuana, cocaine, and cocaine metabolites. He explained that cocaine metabolites are "the breakdown of products of cocaine ... once it is in the body, the body has time to act on it." He said that the presence of "just cocaine" indicated a recent use of the drug, and he concluded that the victim was under the influence of cocaine when the Defendant shot him.

Don Carmen, a forensic scientist with the TBI, testified as an expert in ballistics. He identified the shotgun in evidence as the gun sent to him by the Marshall County Sheriff's Department for examination. He stated that this type of shotgun has a hammer that must be manually pulled back before the gun can be fired. On cross examination, Carmen testified that the particular type of shot used by the Defendant generally has a muzzle velocity of 1300 feet per second. He said that there was no way to measure with what force a shot would hit an object from two feet away, and he did not know whether the amount of force would be sufficient to knock a human being down. He said that a shot from within two feet would not have a "pattern" but would be a solid hole, measuring about one inch.

Officer Lindsay Cook testified that he was working as a 911 operator and dispatcher the day that the victim was shot, and he received the 911 call from Michelle Plemons. He said that he first spoke to Michelle Plemons, but the Defendant eventually took the phone and spoke with him. He said that he was familiar with the Defendant's address because he had previously received several calls from that location in approximately a year and a half leading up to the shooting. He denied that any of these previous calls were in regard to the victim threatening or harming the Defendant or Michelle Plemons. He identified the 911 call audio recording, which was played for the jury. He affirmed that, as the tape revealed, the Defendant said that he opened the door for the victim, and further, the Defendant asked whether he could go outside to close the gate and prevent his chickens from escaping.

On cross-examination, Cook admitted that, at the beginning of the call, he asked if the victim's name was Christopher Land, because he knew officers were dispatched to Land's address earlier that same day, and he knew that Land had been taken to the hospital and transported home again. He testified that he had previously received two or three calls from the Defendant's address about attempted suicides by the victim. He stated that he was the person who dispatched the officers after the victim's mother called on the morning of the shooting, concerned that the victim "may be trying to hurt himself, and he might have a gun." On redirect examination, the officer affirmed that he had received several calls from the Defendant's address and that none of these calls were for any assault or threats made by the victim. He testified that, when the Defendant spoke to him after the shooting, the Defendant stated that he had previously told the officer what the Defendant was going to do.

Barbara Land, the victim's mother, stated that she first met the Defendant when he and the victim were friends in high school, and she did not see the Defendant again until approximately eight months before the shooting. She explained that the Defendant and Michelle Plemons had been to her house and would give the victim a ride when necessary, in exchange for around twenty dollars. She said that the Defendant and Michelle Plemons brought the victim to her house in Franklin the day before the shooting and stayed for about an hour. She recalled that she next heard

from the victim the morning of the shooting, and she could hear the Defendant in the background during that call. Barbara Land testified that the victim said he was going to "turn [the Defendant] in for growing marijuana." She stated that the victim called because he wanted money to pay his landlord, Mrs. Sparks, and to pay some bills. She said that she knew the victim had received and cashed his government check the day before, because she overheard the victim discussing it at her house, and she told the victim she would not give him any money. She said that she told the victim that she would call Mrs. Sparks and make arrangements for his rent, which she did. She recalled that the victim threatened to burn down the house and called her a "bitch," but he did not threaten to harm her personally. She explained that the victim occasionally lost his temper and "would say things," but he never acted on those threats or assaulted her.

Barbara Land testified that she received a second call from the victim "minutes" after the first call, and could still hear the Defendant in the background. She said the victim was angry because she was going to pay Mariquata Sparks and not give him any money. She testified that she received one other call from the victim in which he "said he was just going to kill himself." She recalled that the victim said he had "a gun and pills." Barbara Land denied hearing a "loud noise" during this call. She testified that, when she spoke to Sparks, Sparks conveyed to her that she had spoken to the victim and the victim had threatened to shoot himself. She said that the victim did not threaten to harm anyone but himself. After these calls, Barbara Land called the sheriff's department to check on the victim, and the sheriff's department notified her that they were taking the victim to the hospital for evaluation. After learning that the victim was released, she said, she called the victim's house and the Defendant's house, but was unable to reach anyone.

On cross-examination, Barbara Land testified that she was surprised to hear that the Defendant shot the victim. She said that she had found marijuana in the victim's bathroom, and the Defendant told her that the Defendant was growing it. She testified that she believed that the victim's doctors had stopped prescribing Klonopin for the victim. She said that the victim was "manic depressive bi-polar" and took a lot of drugs. She affirmed that the victim was often mean when he consumed drugs or alcohol.

Mariquata Sparks testified that she owns the property upon which the victim's trailer is located. Sparks recalled that, when she had contacted the victim on two prior occasions regarding property issues, the victim became "irate" and began cursing, but she denied that the victim ever threatened to harm her. She said that, the morning of the shooting, the victim called her, and he was upset and began cursing her, because he was still angry about a property issue and also that Mrs. Sparks had directed purchase offers on his trailer to his mother. She said that the situation "escalated," and the victim threatened to kill himself, claiming that he had a gun. She said that,

after the call, the victim came to her house cursing and said he would "not pay this F rent" to Sparks anymore, and if Sparks tried to force him to pay he would burn down the trailer. On cross-examination, Sparks testified that, the day he was shot, the victim's anger and temper were the worst she had witnessed.

Shannon Richards testified that she is a nurse and was working at the Marshall County hospital when the victim was brought in by the sheriff's department. She testified that the victim was mad about being at the hospital, and he kept trying to pull out his intravenous needle. She recalled that the victim was upset with his mother for calling the ambulance, and he said that he needed to leave because he was supposed to meet with someone who was purchasing his trailer. She said that the victim was not threatening or mean to the hospital staff. Richards said that she took the victim outside for a cigarette at his request. She testified that she called the sheriff's department to return to the hospital because she wanted to prevent the victim from leaving, not because she was afraid of him. She recalled that a man called at some point, identified himself as the victim's brother, and inquired about the victim. She said that the victim told her it was not his brother but his friend, and he spoke on the phone for approximately ten to fifteen minutes. She remembered the victim stating, "I love you man. I love you." during the phone call. She could not remember the name of the man that called the hospital, but she recognized the man's name when she heard that he shot the victim. She said that the victim was happy when he left, and apologized for giving the staff a "hard time." On cross-examination, Richards testified that the victim admitted taking several Klonopin pills, but he denied that he was attempting to overdose. She affirmed that the victim told her he had smoked marijuana and used cocaine. She admitted that the victim was angry with his mother and said his mother was "crazy." She testified that she witnessed the victim go through severe mood changes, from angry to calm, to angry again.

Sharon Crafton testified that she lives in a trailer in the same area as the victim, and she also rented her property from Sparks. She recalled that she saw the Defendant and the victim together almost every day, either at, or going to, one of the their respective trailers. She testified that she never saw the victim and the Defendant argue.

Robert Crafton testified that he is the Defendant's first cousin and lived about 100 yards away from him. He recalled meeting the victim through the Defendant when he was a teenager and then again when the victim and his wife moved into their trailer. He said that he called the Defendant the morning following the shooting and the Defendant stated, "[w]hat did I tell you I would do to the mother f* * *er that came down here f* * *ing with me." Crafton said, however, that the Defendant had not told him he would do anything to anyone. Crafton said that the Defendant told him the victim had called asking for a ride from the hospital and "raising cane," and the Defendant hung up on the victim. He recalled that the Defendant told him that the

victim called back and threatened to "kick his ass," and the Defendant told the victim to "come on." He said that, according to the Defendant, the victim came over and was trying to take the shotgun away from Plemons, and when the Defendant felt the gun touch the victim's face, he pulled the trigger.

Following this evidence, the trial court instructed the jury on second degree murder and three lesser-included offenses. Additionally, the trial court instructed the jury on the affirmative defenses of self-defense and defense of a third person, stating, in part, as follows:

> When a person is assaulted, by the use of force or attempted use of force, in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of death or serious bodily injury, he will be justified in using force to defend himself even to the extent of killing another human being. The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's use of unlawful force. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.
>
> ....
>
> A person may have been mistaken, based on his perception of the circumstances, as to the extent of the actual danger, but if he acts in self-defense from honest even though mistaken, convictions as to the exten[t] of danger, he will not be held criminally liable for his actions.
>
> ....
>
> If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense.
>
> ....
>
> A person is justified in threatening or using force against another to protect a third person if:
>
>> (1) under the circumstances as the person reasonably believes them to be, the person would be justified, under the principles which apply to Self-Defense, in

15

threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected;

and

(2) the person reasonably believes that the intervention is immediately necessary to protect the third person.

Any person using force intended or likely to cause death or serious bodily injury within his or her own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Based upon this evidence and the instructions of the trial court, the jury convicted the Defendant of second degree murder.

Plemons, 2005 WL 468306, at *1-13. The other pertinent findings of the Tennessee appellate court on Petitioner's state post-conviction petition will be presented in the context of Petitioner's ineffective assistance of counsel claim.

## C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." <u>Id.</u> at 412. In <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that

it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir.

1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on

the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision
> was unreasonable must be assessed in light of the record the court had before it. See
> Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam)
> 124 S.Ct., at 4 (denying relief where state court's application of federal law was
> "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029,
> 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in
> light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122
> S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to
> state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must

presume that all determinations of factual issues made by the state court are correct unless the

Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325

F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility

findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

Petitioner must exhaust all claims in state court before asserting those claims in a federal

habeas action. Wilwording v. Swenson, 404 U.S. 249, 250 (1971). For habeas relief, all federal law

claims must be fairly and properly presented to the state courts. Picard v. Connor, 404 U.S. 270, 275

(1971). A claim supported only by citation to state law is insufficient to present a federal claim, even

if the cited state decision restated an analysis of federal law. Anderson v. Harless, 459 U.S. 4, 7 n.3

(1982) (per curiam). As to how the facts and federal legal theory must have been "fairly presented"

to the state courts, in Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (citing Picard and

Anderson), the Supreme Court stated: "If state courts are to be given the opportunity to correct

alleged violations of prisoners, federal rights, they must surely be alerted to the facts that the prisoner are asserting claims under the United States Constitution." Id. Duncan modified and heightened the standard set by Picard. Id. at 367. (Stevens J., dissenting).

If a properly presented federal law claim is not adjudicated in state courts, the AEDPA is inapplicable. Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003). In such instances, the Court "'reviews questions of law and mixed questions of law and fact de novo.'" Id. (citations omitted). If a state court decides a federal law claim, but "does not squarely address the federal constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis, we must carefully review both the record and the applicable law, and may reverse only if we conclude that the State recent decision is contrary to or an unreasonable application of federal law." Filiaggi v. Bagley, 445 F.3d 851, 854 (6th Cir. 2006) (quoting Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir. 2005). In any event, this modified AEDPA standard "[n]onetheless bars the court from reversing unless the state's court's decision is contrary to or an unreasonable application of federal law.'" Maldonado, 416 F.3d at 476.

### 1. Insufficiency of the Evidence Claim

Petitioner asserts that the evidence was insufficient to support Petitioner's conviction for second degree murder as the State failed to prove beyond a reasonable doubt that Petitioner did not act in self-defense.

Addressing Petitioner's insufficiency of the evidence claim, the Tennessee Court of Criminal Appeals found the following:

> The Defendant contends that the evidence is insufficient to sustain his conviction because he acted in self-defense. He argues that the State failed to negate this defense beyond a reasonable doubt. The State counters that the evidence is sufficient to

sustain the Defendant's conviction, and the question of self-defense was properly considered and rejected by the jury. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R.App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn.2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn.2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn.Crim.App.1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn.Crim.App.1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn.1999); Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn.1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn.1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn.2000).

Second degree murder is defined as "[a] knowing killing of another...." Tenn.Code Ann. § 39-13-210 (2003). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn.Code Ann. § 39-11-302(b) (2003). Tennessee's self-defense statute, Tennessee Code Annotated section 39-11-611(a), (b) (2003), provides as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

> (b) Any person using force intended or likely to cause death or serious
> bodily injury within the person's own residence is presumed to have
> held a reasonable fear of imminent peril of death or serious bodily
> injury to self, family or a member of the household when that force
> is used against another person, not a member of the family or
> household, who unlawfully and forcibly enters or has unlawfully and
> forcibly entered the residence, and the person using the force knew or
> had reason to believe that an unlawful and forcible entry occurred.

Additionally, a person is justified in using force to defend a third person if that third person would be justified in using force in his or her own defense, under section 39-11-611, and the person using force "reasonably believes that the intervention is immediately necessary to protect the third person." Tenn.Code Ann. § 39-11-612 (2003). The State has the burden of negating any defense if admissible evidence is introduced supporting the defense. Tenn.Code Ann. § 39-11-201(a)(3) (2003). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. State v. Ivy, 868 S.W.2d 724, 727 (Tenn.Crim.App.1993). It is within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn.Crim.App.1997).

In the case under submission, the evidence produced at trial showed that the victim and the Defendant were close friends who spent almost every day together, often at the Defendant's trailer. The Defendant's wife testified that the victim was always welcome at their home. The victim threatened to tell the police that the Defendant was growing marijuana. The victim came to the Defendant's trailer unarmed, the Defendant opened the door for the victim, and the Defendant shot him in the face. This evidence, viewed in a light most favorable to the state, is legally sufficient to support the Defendant's conviction for second degree murder. Although the Defendant claims he acted in self-defense, the jury was properly instructed on this issue and it rejected this defense. This issue is without merit.

Plemons, 2005 WL 468306, at *13-15.

For a Fourteenth Amendment claim based upon insufficient evidence, in Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court set forth the standard for reviewing the legal sufficiency of the evidence in support of a conviction.

> [T]he critical inquiry on review of the sufficiency of the evidence to support a
> criminal conviction must be not simply to determine whether the jury was properly
> instructed, but to determine whether the record evidence could reasonably support
> a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court

to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. at 318-19 (citations and footnotes omitted) (emphasis in original). The Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." Fiore v. White, 531 U.S. 225, 228-29 (2001).

A presumption of correctness obtains in determining whether there exists sufficient evidence to support a conviction. If any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. Jackson, 443 U.S. at 324. The rule concerning reasonable inferences applies with equal force to historical facts. Parke v. Raley, 506 U.S. 20 (1992) (involving the challenge to a prior conviction that resulted in enhancement of a sentence).

Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirement of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (*per curiam*), and such evidence need not remove every reasonable hypothesis except that of guilt. Tilley v. McMackin, 989 F.2d 222, 225 (6th Cir. 1993). Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution, Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985), but reliance on legislative presumptions to prove facts is insufficient. Hicks v.

Feiock, 485 U.S. 624, 637-40 (1988). It should be noted that this due process guarantee of sufficiency of the evidence extends only to the elements of the crime, not to the state's burden to prove the absence of an affirmative defense, unless the state has made the absence of a defense an element of the crime. See Allen v. Redman, 858 F.2d 1194, 1196-98 (6th Cir. 1988). At that point, sufficiency of evidence on the issue will be relevant. Id. at 1197-98.

Petitioner argues that the evidence showed that Land was a volatile, abusive man who had made threats and was in desperate need of money to buy more cocaine, and was shot when trying to enter Petitioner's home without permission. Petitioner argues that evidence that he killed Land to keep Land from telling the police that Petitioner was growing marijuana was speculative and fell short of disproving that Petitioner did not act in self-defense. Petitioner cites Hudgens v. State, 166 Tenn. 231, 60 S.W.2d 153 (1933).

In Hudgens, the defendant's husband and the victim had been drinking heavily and were very intoxicated. Id. at 154. At the defendant's home, the two men became involved in a fight about money, the defendant paid the victim his money, and the victim left. Id. The victim subsequently returned and the defendant shot him. Id. Analyzing the evidence, the Tennessee Supreme Court stated:

> There is a controversy as to whether Annie Mae latched the screen door when she entered her home. The decided weight of the testimony is that she twice admonished deceased not to come into her home, and that he entered over her protest. The only testimony that contradicts that of Annie Mae to the effect that deceased said he was going to kill her was that of Will Elam, brother of deceased, but we think the weight of the testimony shows that he was not standing in front of the door, as testified to by him, when deceased entered. If deceased was not invited into the home by Annie Mae, and we feel confident that he was not, then unquestionably he entered over the objection of Annie Mae for the purpose of doing violence to her or Wilbur. He had just enough bad liquor in him to make him belligerent and dangerous.

23

Annie Mae was not drinking, and <u>had no conceivable motive for killing deceased except for fear that he would do her violence</u>. She had aided in separating deceased and her husband when they were fighting; she did what she could to appease deceased and get him to leave, but he continued to hang around, and was evidently bent on having an encounter with defendants. He, in effect, forced his way into the home when forbidden to enter. The weight of the testimony shows that Wilbur was in bed drunk and unable to defend his wife. The deceased was young, active, and strong. Annie Mae was no match for him physically. In this situation, what was she to do? The conduct of deceased in the circumstances constituted an overt act.

<u>Id</u>. (emphasis added). The Tennessee Supreme Court recognized that:

a person is justified in taking life in defense of his habitation where it is actually or apparently necessary to do so in order to repel another person who attempts to enter in a forcible or violent manner for the apparent purpose of committing a felony therein upon either person or property or of inflicting great bodily harm or of assaulting or offering personal violence to a person dwelling or being therein.

<u>Id</u>. (quoting 30 Corpus Juris, 83). The Tennessee Supreme Court concluded that the evidence did not support the verdict of voluntary manslaughter and remanded the action for a new trial.

Petitioner's reliance on <u>Hudgens</u> is misplaced as here, the Petitioner had an additional motive to shoot the victim. The Tennessee Court of Criminal Appeals reasonably concluded that the victim threatened to tell the police that Petitioner was growing marijuana, that the victim was unarmed, and Petitioner opened the door and knowingly shot the victim in the face. Thus, the evidence is sufficient to support the jury's rejection of any self-defense and its finding of Petitioner's guilt for second degree murder beyond a reasonable doubt. After reviewing this evidence in the light most favorable to the State, as required by <u>Jackson</u>, the Court concludes that the Tennessee Court of Criminal Appeals reasonably applied <u>Jackson</u> and this claim is not grounds for habeas relief. Further, "the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." <u>Caldwell v. Russell</u>, 181

F.3d 731, 740 (6th Cir. 1999); <u>Allen</u>, 858 F.2d at 1196-98; <u>Booth v. Carlton</u>, 110 F.3d 63, No.

95-6448, 1997 WL 135495, at *2 (6th Cir. March 24, 1997) ("[T]he due process guarantee of

sufficiency of the evidence extends only to facts needed to establish the elements of the crime and

not to the state's burden to prove the absence of an affirmative defense."). Accordingly, the Court

concludes that the state trial and appellate courts' rulings on this claim were neither contrary to nor

an unreasonable application of federal law.

### 2. Ineffective Assistance of Counsel

As to his ineffective assistance of counsel claim, Petitioner asserts that his counsel failed to

use evidence of Petitioner's mental illness to complement Petitioner's assertion of self-defense and

that a lesser defense of imperfect self-defense had a reasonable probability of succeeding. The

Respondent contends that Petitioner did not present this claim to the Tennessee courts and is

procedurally defaulted. In response, Petitioner argues that the state appellate court addressed the

substance of his ineffective assistance of counsel claim *sua sponte*, excusing any procedural default.

Petitioner's grounds for his ineffective assistance of counsel claim before the Tennessee

Court of Criminal Appeals had two components: (1) that his counsel "failed to adequately confer,

meet, and/or communicate with Petitioner regarding the merits of the case, the contents of discovery

provided by the State . . . and improperly advised Petitioner such that Petitioner was not sufficiently

informed to allow him to make a fully informed decision whether to go to trial or settle the case prior

to trial"; and (2) that his counsel "effectively precluded Petitioner from testifying at trial because

counsel failed to sufficiently confer with Petitioner and adequately inform Petitioner to the degree

that Petitioner was unable to make an informed decision regarding his right to testify." (Docket

Entry No. 28, Attachment 9, at 30-31, 33).

In Petitioner's state post-conviction appeal, the Tennessee Court of Criminal Appeals made the following factual findings:

> The petitioner subsequently filed a *pro se* petition for post-conviction relief, and two amended petitions were filed following the appointment of counsel. An evidentiary hearing was held, at which the petitioner, his sister, his father, and trial counsel testified. The petitioner testified that he was currently incarcerated, serving the nineteen-year sentence in this case, as well as a concurrent three-year and nine-month sentence for manufacturing marijuana. He related that his sister had retained trial counsel and an investigator upon trial counsel's suggestion. According to the petitioner, he only met with trial counsel three or four times, and his family was present at all the meetings. The petitioner testified that trial counsel repeatedly told him he was certain that he could prove self-defense at trial.
>
> The petitioner stated that he informed trial counsel that he was disabled and suffered from several mental conditions, including paranoid schizophrenia. According to the petitioner, trial counsel did not pursue this information and did not consider using this information as part of his defense. However, the petitioner admitted that he had gone to Centerstone, a mental health facility, and acknowledged that he was found to be competent to stand trial, that an insanity defense could not be supported, and that there did not appear to be a basis for a claim of diminished capacity. Additionally, the petitioner testified that trial counsel informed him of a plea offer from the State which would resolve both the murder charge and the pending marijuana charge. According to the petitioner, trial counsel informed him that even if they proceeded to trial, he would receive no more than the twelve-year sentence offered by the State. The petitioner testified that he rejected the offer based upon trial counsel's statements.
>
> The petitioner also testified that he did not hear the 911 tape or see the photographs of the crime scene until they were introduced at trial. He did acknowledge that his wife was present at the meetings with counsel and that trial counsel did discuss her testimony with her. However, he testified that her testimony on cross-examination was a surprise and hurt his case. He also stated that he was not aware that the victim's mother was going to testify that the victim said he was going to turn the petitioner in for growing marijuana, which the petitioner stated established the only evidence of motive for the murder. The petitioner did acknowledge that he was shown a copy of the State's witness list prior to trial; however, he denied that he ever saw a copy of the private investigator's reports. According to the petitioner, all of this evidence made him look guilty, and he would have settled the case rather than going to trial if he had known about it. The petitioner stated that he intended to testify at trial, but trial counsel advised him against it, telling him that the State would use the marijuana charge and his past criminal history against him. He testified that if he had taken the

stand, he would have informed the jury of what really happened between himself and the victim, informing the jury about the altercation he had with the victim prior to his arrival at the petitioner's house. He did, however, acknowledge that his wife also testified regarding these events and that his statement containing that information was admitted.

According to the petitioner, counsel informed him just prior to trial that, if he were convicted, he could possibly receive a twenty-five-year sentence. The petitioner acknowledged that he was aware that the murder charge carried a sentence range of fifteen to twenty-five years. The petitioner testified that he then requested that counsel plea bargain the case, but the subject was not discussed further. The petitioner testified that he informed counsel that he would only plead guilty to voluntary manslaughter and accept a sentence of three to six years.

The petitioner's sister and father also testified. Each testified that they were present at all or some of the meetings between the petitioner and trial counsel. Each stated that they heard trial counsel inform the petitioner of the State's offer of a twelve-year plea agreement, six years for the second degree murder and six years for the marijuana charge. According to their testimony, trial counsel stated the petitioner should go to trial because they had a good self-defense case. The petitioner's sister contradicted the petitioner's testimony and said that they had met with trial counsel approximately twenty times, rather than the three or four testified to by the petitioner. She also testified that trial counsel did discuss a mental health defense, but, after discussion, they agreed that the self-defense theory was more appropriate to pursue.

Trial counsel testified and refuted much of the petitioner's testimony. He testified that he met with the petitioner and various family members approximately twenty times prior to trial. According to trial counsel, he received full discovery from the State and shared all the information he received with the petitioner and his family. He specifically testified that he reviewed both a videotape of the crime scene and the tape of the 911 call with the petitioner. He stated that he reviewed the State's witness list with the petitioner and that the list included the victim's mother, the petitioner's wife, and the petitioner's cousin Daryl Crafton. He testified that the private investigator had attempted to interview the witnesses, but several of them refused to speak with him.

According to trial counsel, they discussed pursuing self-defense, as well as a defense based upon the petitioner's mental disorders. However, based upon the evaluation performed on the petitioner, it was decided that the more appropriate defense to pursue was one of self-defense. Counsel specifically stated that he informed the petitioner of the various defenses available and that, ultimately, the decision was the petitioner's.

With regard to a plea agreement, trial counsel testified that he did not tell the petitioner or his family that the State had offered a twelve-year deal. Rather, he stated that he informed them that the State would probably not make an offer in this case but that they could approach the State with an offer. He further informed them that he did not believe the State would accept any offer below twelve to fifteen years, and he informed the petitioner that, if convicted, the sentencing range for second degree murder was fifteen to twenty-five years. According to trial counsel, the petitioner never authorized him to approach the State with an offer. He also informed the petitioner that even though he believed the evidence was sufficient to get a jury instruction on self-defense, the instruction did not insure the jury would accept the defense.

After hearing the evidence, the post-conviction court found that the petitioner had failed to establish his claim of ineffective assistance of counsel and denied post-conviction relief. This appeal followed.

Plemons, 2008 WL 5069193, at *3-5 (emphasis added).

The Tennessee Court of Criminal Appeals then dismissed these claims for the following reasons:

I. The Petitioner's Decision to Proceed to Trial

The petitioner contends that trial counsel was "ineffective in that he failed to adequately confer, meet, and/or communicate with [him] regarding the merits of the case, the contents of discovery provided by the State-particularly the 911 tape-and improperly advised [him] such that [he] was not sufficiently informed to allow him to make a fully informed decision whether to go to trial or settle the case prior to trial." He asserts that the proof presented, specifically that trial counsel represented that "he could beat the State's offer at trial and that the case was 'open and shut' with regard to the merits of the self-defense defense," preponderates against the post-conviction court's finding that he "failed to prove by clear and convincing evidence that his failure to plead guilty did not represent a voluntary and intelligent choice among alternative courses of action open to him."

In finding that the petitioner was not entitled to post-conviction relief on this issue, the trial court made the following findings and conclusions:

> The [petitioner] and [trial counsel] agreed to defend the case on the basis of self-defense and defense of third persons. The Post-Conviction Court finds that under the facts of this case this strategic decision was the logical and obvious defense. The trial court

28

instructed the jury regarding self-defense and defense of third persons, Exhibit Five. The [petitioner] is not entitled to post-conviction relief simply because the jury rejected the defense. Furthermore, on appeal the Court of Criminal Appeals held that the evidence was sufficient to support the conviction. The post-conviction court finds that [trial counsel] was well prepared to pursue this defense and pursued it ably at trial.

The [petitioner] also testified that a private investigator was hired to assist [trial counsel] and that he, the [petitioner], met with the investigator more times than with [trial counsel]. Exhibit Four, the investigator's report, and Exhibit Seven, [trial counsel's] trial notebook, both reflect considerable work and the court finds that [trial counsel] thoroughly investigated the case in all respects, adequately advised the [petitioner] throughout his representation and performed at trial and on appeal above "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 [S.W.]2d 930 (Tenn.1975).

The [petitioner] admitted that [trial counsel] was aware that the [petitioner] suffered from several psychological disorders. The [petitioner] was, in fact, evaluated and found competent to stand trial, Exhibit One. This report further finds neither that the defense of insanity nor diminished capacity could be support[ed]. [Trial Counsel's] decision to concentrate on self-defense was, as stated above, the logical and obvious defense strategy.

....

The [petitioner] complains that he had not reviewed the 911 tape played at trial. Assuming, arguendo that this is true, the [petitioner] failed to prove that this affected the outcome of the trial or any strategic decisions.

The [petitioner] admitted that [trial counsel] and he went over the State's witness list and that he knew his wife was on the list. The [petitioner] testified that he was not aware that the victim's mother could testify, but again the [petitioner] failed to prove at the post-conviction hearing that this affected the outcome of the trial or any strategic decision.

....

The [petitioner] offered conflicting testimony about settlement negotiation, but at one point did acknowledge that [trial counsel] told him he could get twenty-five years. [The petitioner] failed at the post-conviction hearing to prove that the State actually made a plea bargain offer which the [petitioner] could have accepted in lieu of going to trial. The [petitioner's] testimony that he and [trial counsel] talked to one another about possible settlement does not prove that there was an actual offer on the table from the State which the [petitioner] would have accepted. Thus, the [petitioner] failed to prove by clear and convincing evidence that his failure to plead guilty did not represent a voluntary and intelligent choice among alternative courses of action open to him. Accordingly, there is no showing of an abridgement of a constitutional right that would entitle him to post-conviction relief....

After review of the record, we find nothing to preponderate against the post-conviction court's findings. Of particular importance, as noted by the trial court, is the petitioner's failure to establish that a plea agreement was actually offered by the State. He offers only his self-serving testimony, corroborated only by his family members' testimony, that he was ever informed of a twelve-year agreement. Trial counsel refuted that testimony, specifically stating that no plea agreement was offered and that the petitioner had not authorized him to approach the State regarding an offer. The post-conviction court obviously accredited trial counsel's testimony. It is not the province of this court to revisit issues of credibility of witnesses. Black v. State, 794 S.W.2d 752, 755 (Tenn.Crim.App.1990). Failing to establish the existence of an offer refutes the petitioner's argument that he was not adequately informed to make a choice among the alternatives, as no option other than to proceed to trial existed.

Regardless, the record further supports that trial counsel more than adequately investigated the facts of the case and possible strategies to pursue at trial and sufficiently met with and discussed the case with the petitioner. Trial counsel testified that he received discovery from the State, including the 911 tape and the crime scene video, and that he reviewed the materials with the petitioner. He also testified that he was aware of the petitioner's mental conditions, but, based upon the evaluation, the decision was made to pursue self-defense. We agree with the post-conviction court that the petitioner has not established his claim and is, thus, not entitled to relief.

II. Right to Testify

Next, the petitioner contends that trial counsel was ineffective "in that [trial] counsel effectively precluded [the p]etitioner from knowingly and intelligently exercising his

right to testify" because trial counsel "failed to sufficiently confer with [the p]etitioner and adequately inform [the p]etitioner to the degree that [the p]etitioner was unable to make an informed decision regarding his right to testify." He asserts that he established this abridgement of his constitutional right and further, relying upon the factors in <u>Momon v. State</u>, 18 S.W.3d 152 (Tenn.1999), that the violation is not harmless beyond a reasonable doubt.

The petitioner is correct that the right of a defendant to testify in his own trial has been recognized by the Tennessee Supreme Court as a fundamental constitutional right and that the right must be personally waived by the defendant. <u>Momon</u>, 18 S.W.3d at 162. Moreover, "[g]enerally, a right that is fundamental and personal to the defendant may only be waived if there is evidence in the record demonstrating 'an intentional relinquishment or abandonment of a known right or privilege.' The waiver of a fundamental right will not be presumed from a silent record, and the courts should indulge every reasonable presumption against the waiver of a fundamental right." <u>Id</u>. at 161-62.

In denying relief on this ground, the post-conviction court found as follows:

> The [petitioner] testified that he decided not to testify after [trial counsel] told him he would be cross-examined about the manufacture of marijuana. The Court finds that since there was proof in the State's case-in-chief that the victim had threatened to turn the [petitioner] in for marijuana, [trial counsel] correctly advised the [petitioner] on this issue. Further, the trial court addressed the [petitioner] about the decision of whether to testify and the [petitioner] clearly told the trial court that he chose not to testify, Exhibit 6C pages 540, 541. Further, the [petitioner] testified at the post-conviction hearing about what he would have said if he'd testified at trial. The jury heard essentially the same testimony in the form of the [petitioner's] statement. Accordingly, the [petitioner] was able to advance his self-defense argument without being cross-examined.

Again, we find nothing to preponderate against the post-conviction court's findings, as the record supports a valid waiver of the right by the petitioner. The record on appeal includes the voir dire of the petitioner conducted by the trial court and trial counsel and indicates that the petitioner, after being informed of the right in open court, stated that it was his decision not to testify in his defense. Moreover, at the post-conviction hearing, the petitioner also specifically testified that it was his choice not to testify in his own defense because trial counsel informed him, correctly, that the pending marijuana charge could be used to impeach him. Thus, the post-conviction court found that the petitioner knowingly, voluntarily, and intelligently waived his right to testify. As noted by the State, because the petitioner

> failed to establish the abridgement of his constitutional right to testify, the <u>Momon</u> factors relied upon by the petitioner are not relevant to our determination. Moreover, as the post-conviction court also found, the petitioner failed to establish prejudice as his statement containing the same information was introduced at trial. Thus, the petitioner has not established his claim.

<u>Id</u>. at 6-9 (emphasis added).

As discussed earlier, a habeas petitioner must present claims to the state courts as federal constitutional issues rather than state law issues with some reference to federal law. <u>Duncan</u>, 513 U.S. at 365-66. This standard is related to "the doctrine of exhaustion [that] requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." <u>Wong v. Money</u>, 142 F.3d 313, 322 (6th Cir. 1998). As a matter of federal law, to avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. <u>Covington v Mills</u>, 110 Fed. Appx. 663, 666 (6th Cir. 2004).

The Supreme Court defined the "Procedural Default Doctrine" for federal habeas proceedings as barring federal habeas relief in certain instances, stating:

> This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. <u>This rule applies whether the state law ground is substantive or procedural</u>. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. <u>Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory</u>.
>
> * * *
>
> <u>The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural grounds</u>.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (emphasis added and citations omitted).

The rationale for this doctrine arises out of judicial respect for federalism and maintaining comity with state courts, id at 730-32, and the doctrine also serves a legitimate state interest in finality of state convictions. Francis v. Henderson, 425 U.S. 536, 542 (1976). State procedural rules that channel the controversy to the state trial and appellate courts must be honored because failure to do so "deprives the [state] appellate court of an opportunity to review trial error, and 'undercut[s] the State's ability to enforce its procedural rule[s].'" Murray v. Carrier, 477 U.S. 478, 491 (1986) (quoting Engle v. Isaac, 456 U.S. 107, 129 (1982)).

As the Sixth Circuit stated in Williams v. Anderson, 460 F.3d 789 (6th Cir. 2006), there are two types of procedural default:

> First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. Lundgren v. Mitchell, 440 F.3d 754, 763 (6th Cir. 2006) (citing Washington v. Sykes, 433 U.S. 72, 87, 97 (1977)); see also Maupin v. Smith, 758 F.2d 135, 138 (6th Cir. 1986). If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted. Id.

> Second, a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's "ordinary appellate review procedures." O'Sullivan v. Boerckel, 526 U.S. 838, 848-7 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted. Engle v. Isaac, 456 U.S. 107, 125 n. 28 (1982); see also Coleman v. Thompson, 501 U.S. at 731-32. This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." Engle, 456 U.S. at 125 n.28. Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review. Id.

Id. at 806.

The Sixth Circuit defined the analysis under the procedural default doctrine in <u>Maupin v.</u>

<u>Smith</u>, 785 F.2d 135 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> ***
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction.
>
> ***
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.... This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

<u>Id</u>. at 138 (citations omitted).

Petitioner did not present this ground for his ineffective assistance of counsel claim before the state courts and under state rules that claim is waived under Tenn. Code Ann. § 40-30-106(g) by virtue of his post-conviction appeal and is also time barred under Tenn. Code Ann. § 40-30-102(a).

Procedural rules such as statutes of limitations have been found to be independent and adequate. In <u>Coleman</u>, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. In <u>Brown v. Allen</u>, 344 U.S. 443 at 485-86 (1953), the Court also applied the procedural default rule to a state rule that placed time limits on appellate rights. <u>Accord</u> <u>Reed v. Farley</u>, 512 U.S. 339

(1994) (denying writ due to waiver of delay under the Interstate Agreement on Detainers by failure to object at trial and to establish prejudice).

In <u>Hutchison v. Bell</u>, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations on post-conviction petitions and <u>Burford</u> exception in a procedural default analysis:

> Hutchison argues that Tennessee courts' willingness to excuse procedural default pursuant to <u>Burford</u> demonstrates that state procedural rules are not regularly followed in the context of later-arising claims.
>
> . . . .
>
> Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in <u>Burford</u> and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented. . . .
>
> . . . .
>
> In <u>Hannah v. Conley</u>, 49 F.3d 1193 (6 th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for post-conviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. <u>Id</u>. at 1197. The <u>Hannah</u> court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. <u>Id</u>. at 1196. The current one-year statute of limitations contains the same mandatory language. <u>See</u> T.C.A. § 40-30-202(a).
>
> Although the previous cases did not present a <u>Burford</u> type later arising claim, we do not find that the state's <u>Burford</u> tolling rules command a different result. . . .
>
> Given that tolling under <u>Burford</u> is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the <u>Burford</u> exception does not render Tennessee's procedural rules inadequate.

Id. at 738-739. (footnotes and citations omitted).

The Sixth Circuit also ruled in Hutchinson that despite the Burford exception to the Tennessee timeliness rule, Burford was not a separate constitutional claim. Id. at 740-41. In a word, Hutchinson found the Tennessee limitations rule to constitute a firmly established and regularly followed state law. Thus, the Court concludes that Tennessee's limitations statute is an independent and regularly enforced state rule.

The Sixth Circuit has also found that the Tennessee waiver statute, Tenn. Code Ann. § 40-30-106(g), to be an independent and adequate state rule that is regularly enforced. Cone v. Bell, 243 F.3d 961, 969 (6th Cir. 2001), overruled on other grounds by Bell v. Cone, 535 U.S. 685 (2002). Thus, the Court concludes that Petitioner's claim that Respondent challenges is procedurally defaulted. Williams, 460 F.3d at 806.

With this procedural default, Petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. Cause for a procedural default must depend on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. Id. at 753. "Prejudice . . . requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." Jamison v. Collins, 291 F.3d 380, 388 (6th Cir. 2002) (citing United States v. Frady, 456 U.S. 152, 170-71 (1982)). A fundamental miscarriage of justice requires a showing that the alleged "constitutional violation has probably resulted in the conviction of one who

is actually innocent." <u>Murray</u>, 477 U.S. at 496. This exception applies only in "extraordinary case[s]." <u>Id</u>.

To serve as cause, the specific ineffective assistance of counsel claim, must itself not be subject to procedural default absent a showing of a miscarriage of justice and/or a showing of cause and prejudice for that claim. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 448, 453 (2000) ("to hold, as we do, that an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted is not to say that procedural default may not itself be excused, if the prisoner can satisfy the cause-and-prejudice standard with respect to that claim.").

Here, Petitioner failed to present his counsel's failure to assert the defense of imperfect self-defense as a ground for his ineffective assistance of counsel claim to the state courts. Thus, any omission of Petitioner's counsel in the state post-conviction proceedings is defaulted and cannot establish cause. <u>Coleman</u>, 501 U.S. at 756-57.

Yet, Petitioner argues that the Tennessee Court of Criminal Appeals, nevertheless, addressed the substance of his claim, and thus, the claim was fairly presented to the state courts under <u>Jones v. Dretke</u>, 375 F.3d 352, 354 (5th Cir. 2004). As proof, Petitioner cites the Tennessee Court of Criminal Appeals's recitation of the trial court's findings and conclusions that: (1) "[trial counsel] was aware that the [petitioner] suffered from several psychological disorders;" (2) "neither . . . the defense of insanity nor diminished capacity could be support[ed];" and (3) "[Trial Counsel's] decision to concentrate on self-defense was . . . the logical and obvious defense strategy." <u>Plemons</u>, 2008 WL 5069193, at *7. Petitioner asserts that the appellate court, in essence, concurred with the postconviction trial court's conclusion that the decision to pursue only the defense of self-defense

was "logical and obvious," even though trial counsel was aware of the mental illness evidence, and thus, the appellate court addressed and rejected the substance of Petitioner's claim.

The Tennessee Court of Criminal Appeals stated, in relevant part:

> Regardless, the record further supports that trial counsel more than adequately investigated the facts of the case and possible strategies to pursue at trial and sufficiently met with and discussed the case with the petitioner. Trial counsel testified that he received discovery from the State, including the 911 tape and the crime scene video, and that he reviewed the materials with the petitioner. He also testified that he was aware of the petitioner's mental conditions, but, based upon the evaluation, the decision was made to pursue self-defense. We agree with the post-conviction court that the petitioner has not established his claim and is, thus, not entitled to relief.

Id. at *8 (emphasis added).

To be sure, the state court did not explicitly address the substance of Petitioner's claim about the imperfect self-defense theory. Assuming this claim is subsumed by the self-defense theory that the Tennessee courts addressed, Petitioner must also show prejudice. Under Strickland v. Washington, 466 U.S. 668, 687 (1984), Petitioner must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. Petitioner cites an unpublished Tennessee Court of Criminal Appeals decision, State v. Horton, 1988 WL 9421 (Tenn. Crim. App., Feb. 10, 1988), for the proposition that "imperfect self-defense" is an available defense in Tennessee. In Horton, the state court stated that imperfect self-defense "is, in our opinion, only a label for that factual situation in which the provocation is sufficient to reduce murder to manslaughter. Its application is usually seen in homicides involving battered spouses and certain stress disorders. It still remains for the jury to determine all questions regarding provocation." Id. at *4. The state court further concluded "there is no evidence of provocation immediately prior to the killing. Even so, the instructions to the jury

38

in the instant case fully covered it anyway." Id. The state court also noted that the jury was instructed on the elements of manslaughter. Id.

Here, the state trial court instructed the jury on the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide along with instructions on self-defense and defense of a third person. (Docket Entry No. 27, Attachment 1 at 74, 77-82). There was a sufficient factual basis for the jury to decide whether there was sufficient provocation to reduce Petitioner's murder charge to manslaughter. See also State v. Wright, 756 S.W.2d 669, 674 (Tenn. 1988) (trial court was not required to give requested jury instruction regarding "imperfect self-defense," where court instructed jury on self-defense and manslaughter, and thus, the requested instruction was fully covered); State v. Christian, 1989 WL 41560 (Tenn. Crim. App. April 28, 1989) (trial court was not required to give requested jury instruction regarding "imperfect self-defense," where court instructed jury on first degree murder and voluntary manslaughter).

Moreover, Petitioner's reliance on Wooten v. State, 171 Tenn. 362, 103 S.W.2d 324 (1937) and State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991) is equally misplaced as Wooten, involved a defendant whose conviction for second-degree murder was reduced to manslaughter where the evidence showed that the defendant's "resentment and anger was aggravated into passion by the conduct of [her] relatives . . . forcing their way" into her home and that "[p]rovocation to passion" was adequate to reduce the killing to manslaughter. 103 S.W.2d at 325-26. Here, the Petitioner had a separate motivation to kill the victim. Zimmerman is factually inapposite where the counsel was not ineffective for failing to present evidence of battered-wife syndrome, but was ineffective based upon cumulative error where counsel promised the jury they

would hear proof about a battered-wife syndrome defense, then failed to present any proof as to that defense and abandoned the defense mid-trial without a valid reason.

Accordingly, for these reasons, the Court concludes that the Respondent's motion for summary judgment should be granted and the Petitioner's motion for summary judgment should be denied and therefore the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ⟨2 7th⟩ day of July, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge